UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MAMEMOR MBACKE, an individual
doing business as Arts
d'Afrique,

       NO. CIV. S:06-1356 FCD EFB

      Plaintiff,

   v.                    MEMORANDUM AND ORDER

TRANSCON CARGO, INC., a
California corporation,

      Defendant.
_____/

AND ALL RELATED ACTIONS.
_____/

----oo0oo----

    This matter is before the court on motions for summary
judgment brought by third-party defendant/fourth-party plaintiff
Shipco Transport, Inc. ("Shipco") and third- and fourth-party
defendant Maersk Sealand, Inc. ("Maersk").[1]  For the reasons set

---

    [1]   Because oral argument will not be of material
assistance, the court orders these matters submitted on the
briefs.  E.D. Cal. L.R. 78-230(h).

forth below, Shipco's and Maersk's motions for summary judgment
are DENIED.

BACKGROUND[2]

    **A.**   **The Mbacke and Transcon Contracts**

      Plaintiff Mamemor Mbacke ("Mbacke") entered into two written
contracts with Transcon Cargo, Inc. ("Transcon"), a freight
forwarder, to arrange for the shipment of two ocean containers,
one traveling from California to Dakar, Senegal (the "Senagal
shipment") and another traveling from Oakland, California to
Kampala, Uganda (the "Uganda shipment"). (RMUF ¶ 1.)[3]  The
Uganda shipment, the only shipment at issue on the motions,
consisted of a 40-foot container carrying used computers,
monitors, servers, and x-ray equipment. (RMUF ¶ 2.)  The
shipment was to be delivered to Shell Mulaugo, the consignee of
the cargo. (RMUF ¶ 5.)  Merian Zakye ("Zakye") was the owner of
Shell Mulaugo. (RMUF ¶ 5.)

---

    [2]    Unless otherwise noted, the facts herein are
undisputed. (See Pl.'s Response to Maersk's Stmt. Of Undisp.
Facts ("RMUF"), filed Jan. 2, 2008; Pl.'s Response to Shipco's
Stmt. Of Undisp. Facts ("RSUF"), filed Jan. 2, 2008.)  Where the
facts are in dispute, the court recounts plaintiff's version of
the facts. (See Pl.'s Stmt. Of Add'l Disp. Facts ("ADF"), filed
Jan. 2, 2008 [Plaintiff refers to these facts as "undisputed"
facts, but they are properly treated as additional *disputed*
facts.].)

    [3]    The court notes that Maersk filed objections to
evidence, in which Shipco joined, on January 16, 2008, objecting
to various aspects of Mbacke's evidence submitted in opposition
to the motions.  Except where otherwise noted below, the court
finds Maersk's objections irrelevant to the motion, as the court
does not rely upon the subject evidence in rendering its
decision.  As such, Maersk's objections are overruled as moot.

2

**B.    The Subcontracts**

Trascon, acting as Mbacke's forwarding agent, hired Shipco, a Non-Vessel Operating Carrier ("NVOCC"),[4] to transport the Uganda shipment.  (RMUF ¶¶ 3-4; RSUF ¶ 5.)  Shipco, in turn, hired Maersk as the underlying carrier for the Uganda shipment. (RMUF ¶ 4.)

**C.    The Shipment Leaves Oakland**

Maersk loaded the container onto its vessel in Oakland on or about December 27, 2004.  (RMUF ¶ 9.)  Mbacke claims he expected the shipment to arrive in Kampala within 35 days.  (RMUF ¶ 15.) Zakye also asserts that she expected the cargo to arrive in January 2005.  (RMUF ¶ 17.)  In any event, Mbacke expected the cargo would arrive in Kampala no later than March 2005.  (RMUF ¶ 16.)

Mbacke had individually shrink-wrapped each piece of cargo, loaded them into the container, and sealed the container before Maersk received it.  (RMUF ¶ 9.)  Mbacke had stored the cargo in an enclosed warehouse prior to loading the container, and the container was not damaged.  (ADF ¶ 5.)  (ADF ¶ 5.)  Both Shipco and Maersk issued bills of lading for the Uganda shipment.  (RMUF ¶¶ 6, 10.)

**1.    The Shipco Bill of Lading**

Shipco issued a bill of lading for the Uganda shipment on December 30, 2004.  (RMUF ¶ 6.)  The bill of lading consisted of two pages, a front page and a back page.  (RMUF ¶ 6; Shipco's Ex.

---

[4]    An NOVCC is statutorily defined as "a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier."  46 U.S.C. § 1702(17)(B).

3

1, filed Nov. 29, 2007.)  Mbacke claims he never received the
back page of the bill of lading.[5]  (ADF ¶ 12.)

### a.   Front page

The front page of the bill of lading contained information
about the Uganda shipment.  The bill of lading named African
American Import/Export Group, the name under which Mbacke was
doing business, as the shipper.  (RMUF ¶ 6.)  The consignee was
identified as Shell Mulaugo, and Transcon was named as the
forwarding agent.  (RMUF ¶ 6.)  The carrying vessel was listed as
Dirch Maersk, and Maersk Uganda Limited was identified as the
person to apply to for delivery in Uganda.  (RMUF ¶ 6.)  The bill
of lading listed Mombasa, Kenya[6] as the port of discharge for the
Uganda shipment.  (RMUF ¶ 13.)

The front page of the bill of lading also contained
information regarding the cargo.  The bill of lading designated
the number of packages as "1."  (RSUF ¶ 11.)  In the section
labeled "Description of Packages or Goods," the bill of lading
listed "1559 pieces."  (RSUF ¶ 13.)  The bill of lading also
contained a designated space to declare an excess value for the
cargo, which was not filled in.  (RSUF ¶¶ 14-15.)  Shipco charged
$7,967 in freight for the shipment.  (RMUF ¶ 8.)

---

[5]     Mbacke also claims the front page bill of lading
produced by Shipco and Maersk is not the bill of lading front
page he received.  The court notes that the faxed copy of the
bill of lading produced by Mbacke is missing the freight and
charges information contained in Shipco's proffered copy of the
bill of lading.  (Compare Pl.'s Ex. B, filed Jan. 2, 2008, with
Shipco's Ex. 1, filed Nov. 29, 2008.)

[6]     Uganda is a landlocked country.  (RSUF ¶ 16.)  Mombasa,
Kenya is the closest ocean port to Kampala, Uganda.  (RSUF ¶ 17.)

### b.   Back page

The back page of the bill of lading contained several terms and conditions regarding Shipco's liability.  First, a "Clause Paramount"[7] stated that the liability of the carrier[8] would be exclusively determined pursuant to the Carriage of Goods by Sea Act ("COGSA").  (RMUF ¶ 32.)  The application of COGSA extended to the entire time the goods were in the custody of the carrier or participating carrier.[9]  (RMUF ¶ 32.)

The bill of lading also limited the carrier's liability to $500 per package or shipping unit in the event of loss or damage.  (RMUF ¶ 33.)  This provision could be avoided by declaring the value of the cargo, on the front page of the bill of lading, and paying a correspondingly higher freight rate.  (RMUF ¶ 34.)  Similarly, the bill of lading provided that the carrier would not under any circumstance be liable for any consequential loss or damage as a result of delay.  (RMUF ¶ 35.)

---

[7]     A Clause Paramount is a statement required by federal law to be in a bill of lading for transportation of goods by sea from the United States to a foreign port.  Carriage of Goods by Sea Act ("COGSA") § 13 (codified at 46 U.S.C. § 30701 note (2007)).  The clause specifies that COGSA governs the bill of lading.  Id.

[8]     A "carrier" is defined by the bill of lading as "the Company stated on the front of this Bill of Lading as being the Carrier on whose behalf this Bill of Lading has been signed." (RMUF ¶ 27.)

[9]     The bill of lading defined "participating carrier" as "the ocean carrier and any other water, land or air carrier involved in the Carriage of the Goods whether it be a Port to Port or a Combined Transport movement." (RMUF ¶ 28.)

Lastly, the bill of lading contained a "Himalaya Clause"[10] that extended its terms and conditions to Shipco's agents and independent contractors, including participating carriers. (RMUF ¶ 31.)  The bill of lading also required all suits to be brought within one year of the date of delivery of the cargo or the date the cargo should have been delivered.  (RMUF ¶ 30.)

## 2.   The Maersk Waybill

Maersk issued a non-negotiable waybill ("waybill") for the Uganda shipment on January 6, 2005.  (RMUF ¶ 10.)  The waybill consisted of a single page, but expressly incorporated the terms and limitations of Maersk's long form bill of lading.  (RMUF ¶ 22.)  Plaintiff claims he never received a copy of the waybill. (UF ¶ 13.)

### a.   Single page waybill

The waybill contained information about the Uganda shipment. The shipper on the waybill was identified as Shipco, and Shell Mulaugo was listed as the consignee. ( RMUF ¶ 10.)  The waybill identified Mombasa, Kenya as the port of discharge for the Uganda shipment.  (RMUF ¶ 14.)

---

[10]   A Himalaya Clause is a contractual provision for the benefit of a third-party that is not a party to the contract. The term originates from the English Court of Appeal decision in <u>Adler v. Dickson</u>, (1954) 2 Lloyd's Rep. 267 (A.C.), in which a passenger on the S.S. Himalaya was injured while crossing the gangway.  The passenger's ticket contained a no-liability clause exempting the carrier, so the passenger sued the ship master and boatswain.  The ship master and boatswain argued they too were exempt from suit pursuant to the no-liability clause.  The court ultimately disagreed with the ship master and boatswain, finding the ticket did not expressly or impliedly benefit servants or agents.  Following the decision, however, so-called "Himalaya" clauses expressly *benefitting* stevedores and others began to be included in bills of lading.

6

The waybill also contained information regarding the cargo. In the space designated for the description of the goods or packages, the waybill listed "1 x 40 container said to contain 1559 pieces." (RMUF ¶ 11.)  The waybill designated the number of packages as "1." (RMUF ¶ 11.)  The waybill also provided a space for declaring the value of the cargo, which was not filled in. (RMUF ¶ 12.)  Maersk charged $7,911 in freight for the shipment. (RMUF ¶ 12.)

### b.   Long form bill of lading

Maersk's long form bill of lading, incorporated by reference in the waybill, contained numerous terms and conditions on Maersk's liability.  Many of these terms and limitations are the same as those contained in Shipco's bill of lading.  For example, Maersk's liability for loss or damage to cargo was limited to $500 unless a higher value for the cargo was declared.  (RMUF ¶¶ 23-24.)  There was one difference, however, between the Shipco bill of lading and Maersk's long form bill of lading.  While Shipco's bill of lading stated Shipco would not in any circumstances be liable for consequential loss or damage, Maersk's long form bill of lading limited Maersk's liability for consequential loss or damages to the amount of the freight charges.  (RMUF ¶ 25.)

### D.   **The Shipment Arrives in Mombasa**

The container arrived at the port of Mombasa on or about March 7, 2005.  (RMUF ¶ 19.)  The parties dispute the next sequence of events.

Maersk asserts that sometime before March 6, 2005, it sent an arrival notice to the consignee stating that the container was

due to arrive on or about March 6, 2005, and was expected to be
available for delivery to the consignee on or about March 31,
2005.  (RMUF ¶ 18.)  Zakye denies receiving such notice.  (Pl.'s
Ex. D ¶ 7, filed Jan. 2, 2008.)

Zakye maintains that sometime in March 2005 Maersk informed
her that a revised invoice, showing the dollar value of the
individual goods, was required by Mombasa customs to release the
container.  (UF ¶ 10.)  Zakye asserts that she provided this
documentation in April 2005.  (UF ¶ 10; Pl.'s Ex. D ¶ 5, filed
Jan. 2, 2008.)  According to a letter produced by Shipco,
however, Maersk requested the revised invoice in April 2005.
(Shipco's Ex. 3, filed Nov. 29, 2007.)

Mbacke and Zakye assert they made repeated inquiries into
the status and location of the container after it failed to be
delivered in January 2005.  (UF ¶¶ 8, 14.)  They further claim
Maersk continually represented the cause of delay as "backlog."
(UF ¶¶ 8, 11.)  Shipco asserts that any delay regarding the
shipment was due to Zakye's failure to submit the revised
invoice.  (RSUF ¶ 19.)  However, an internal email from a Shipco
employee faults Maersk as the source of the delay and failure to
locate the container:

> This is unacceptable..how come you just found out about
> it??  These had been requested since February and you
> are sending them now???  Thi a totally lack of
> professionalism,  Am I supposed to tell my customer
> Maersk was supposed to send docs their agent in
> February and you sti haven't??  What about the
> container..where is it??  You still have not answered
> question..where is the container right now??  Did you
> call yr agent this morning as you promised??  Mindy,
> Can you pls help??  It seems that your customer service
> and documentat dept are not able give us the answer we

8

are looking for.[11]

(UF ¶ 19; Pl.'s Ex. C p. 6, filed Jan. 2, 2008.)

The parties also disagree as to when the container left
Mombasa and arrived in Kampala.  Maersk asserts the container
left Mombasa on July 9, 2005, and arrived in Kampala on July 13,
2005.  (RMUF ¶ 20.)  Zakye, however, maintains that Maersk
notified her of the container's arrival in August 2005.  (UF ¶
15; Pl.'s Ex. D ¶ 7, filed Jan. 2, 2008.)  Neither party disputes
that Zakye rejected the cargo in August 2005, allegedly because
of water contamination.  (RMUF ¶ 21.)

        E.    **The Instant Action**

On April 21, 2006, Mbacke filed a complaint in Sacramento
Superior Court against Transcon alleging four causes of action:
(1) breach of contract; (2) breach of the covenant of good faith
and fair dealing; (3) intentional and negligent
misrepresentation; and (4) conversion.  Mbacke claims the value
of the cargo was $88,000 and that he suffered consequential
damages of $340,000.  (UF ¶¶ 23-24.)

---

[11]    Shipco and Maersk object to the court's admission of
this evidence as hearsay.  Because it is an email from one of
Shipco's employees to Maersk, it falls within the hearsay
exception for an admission by a party-opponent.  Fed. R. Evid.
801(d)(2) ("A statement is not hearsay if . . . offered against a
party and . . . [a statement] by a party's agent or servant
concerning a matter within the scope of the agency or employment,
made during the existence of the relationship[.]")  Relating to
this email, Mbacke filed a declaration on January 16, 2008; said
declaration was untimely filed.  However, the court has
consideration the declaration, in some respects relevant to the
motion, since there is no prejudice to Shipco or Maersk in that
they filed formal objections to the email, as well as other
objections to evidence, which addressed the matters contained in
Mbacke's declaration.

On June 16, 2006, Trancon removed the complaint to this court and filed a third-party complaint against Shipco. Shipco, in turn, filed a fourth-party complaint against Maersk on November 17, 2006. Transcon amended its third-party complaint on May 8, 2007, to name Maersk as a third-party defendant.

On December 26, 2007, Mbacke stipulated to the dismissal of Transcon. Transcon thereafter stipulated to dismiss its third-party complaint against Shipco and Maersk on January 2, 2008.[12] Thus, this matter proceeds presently on Shipco's fourth-party complaint against Maersk.

### STANDARD

The Federal Rules of Civil Procedure provide for summary judgment where "the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). The evidence must be viewed in the light most favorable to the nonmoving party. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the

---

[12] Said stipulation of dismissal was entered after the filing of the instant motions for summary judgement. Thus, to the extent the motions are directed at Transcon, they are now moot and those issues are not considered by the court herein.

10

ultimate burden of persuasion at trial.  <u>Nissan Fire & Marine</u>
<u>Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000).
However, if the nonmoving party has the burden of proof at trial,
the moving party only needs to show "that there is an absence of
evidence to support the nonmoving party's case."  <u>Celotex Corp.</u>,
477 U.S. at 325.

Once the moving party has met its burden of proof, the
nonmoving party must produce evidence on which a reasonable trier
of fact could find in its favor viewing the record as a whole in
light of the evidentiary burden the law places on that party.
<u>See</u> <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th
Cir. 1995).  The nonmoving party cannot simply rest on its
allegations without any significant probative evidence tending to
support the complaint.  <u>See</u> <u>Nissan Fire & Marine</u>, 210 F.3d at
1107.  Instead, through admissible evidence the nonmoving party
"must set for specific facts showing that there is a genuine
issue for trial."  Fed. R. Civ. P. 56(e).

**ANALYSIS**

Section 4(5) of COGSA[13] limits a carrier's liability for
loss of damage of goods to $500 per package.  46 U.S.C. App. §
1304(5). The shipper may, however, increase the carrier's
liability by declaring on the bill of lading a higher value for
the goods shipped, and paying an accordingly higher freight
charge.  Under the law of the Ninth Circuit, a carrier can take

---

[13]    COGSA applies to any contract for carriage of goods
between a port in the continental United States and a foreign
port.  COGSA § 13 (codified at 46 U.S.C. § 30701 note (2007)).
The Uganda shipment of goods from Oakland, California to Mombasa,
Kenya satisfies this requirement.

advantage of COGSA's liability limit "only if the shipper is
given a 'fair opportunity' to opt for a higher liability by
paying a correspondingly greater charge."  Nemeth v. General S.S.
Corp., 694 F.2d 609, 611 (9th Cir. 1982).  The fair opportunity
requirement is meant to give the shipper notice of the legal
consequences of failing to opt for a higher freight rate.  Id.

The carrier bears the initial burden of proving "fair
opportunity."  Id.  The carrier can meet this initial burden by
showing that the language of COGSA Section 4(5) is contained in
the bill of lading.  Id.  Such an express recitation is prima
facie evidence that the shipper was given a fair opportunity to
choose a higher liability.  Id.  The burden of disproving fair
opportunity is then shifted to the shipper.

###    A.   Unreasonable Deviation

As a threshold matter, Mbacke argues that any contractual
limitations on Shipco's or Maersk's liability are unenforceable
because a triable issue of fact exists as to application of the
doctrine of unreasonable deviation, whereby a deviation[14] from
the contract of carriage deprives a carrier of Section 4(5)'s
liability limitations.  Mbacke thus argues that the court need
not reach the merits of Shipco's and Maersk's motions for summary
judgment.  The court disagrees.

At common law, a geographic deviation from a scheduled route
of voyage stripped a carrier of its defense to liability based on

---

[14]   A deviation is defined as a "voluntary departure
without necessity, or any reasonable cause, from the regular and
usual course of the voyage."  Vision Air Flight Serv., Inc. v.
M/V Nat'l Pride, 155 F.3d 1165, 1175-76 n.12 (9th Cir. 1998)
(internal quotation and citation omitted).

12

exculpatory provisions of a bill of lading.  <u>Vision Air Flight</u>
<u>Servs. v. M/V Nat'l Pride</u>, 155 F.3d 1165, 1170 (9th Cir. 1998).
The deviation was regarded as exposing the goods to such
unreasonable risks not anticipated by the parties as to
constitute a breach of the contract for carriage.  <u>Id.</u> at 1171.
Although the doctrine was initially limited to geographic
deviations alone, its underlying rationale applied to other
contexts in which a carrier exposed goods to unreasonable risks
not contemplated by the parties.  <u>Id.</u>  The doctrine therefore
expanded to include serious breaches of the contract for
carriage, which became known as "quasi-deviations."  <u>Id.</u>  The
most common example of quasi-deviation was stowage of cargo on
deck.  <u>Id.</u>

    Although the doctrine was traditionally applied broadly, the
Ninth Circuit in <u>Vision Air Flight Servs. v. M/V Nat'l Pride</u>, 155
F.3d 1165 (9th Cir. 1998), held the enactment of COGSA "limited
the circumstances under which it applies."  <u>Id.</u> at 1172.  Only
intentional destruction of the goods a carrier contracts to
transport constitutes an unreasonable deviation; it is not enough
to show the carrier was negligent, grossly negligent, or even
reckless.  <u>Id.</u> at 1175.

    Thus, under the current law in the Ninth Circuit, in order
for Mbacke to withstand summary judgment, he must present
admissible evidence supporting an inference of intent on the part
of Shipco and/or Maersk to damage the cargo.  The court finds
Mbacke has not satisfied this burden.

    Mbacke admits the cargo was properly routed through Mombasa.
However, he argues the continued delay on the part of Shipco and

Maersk evince an intent to damage the cargo.  With respect to
Shipco, there is no evidence in the record from which to infer an
intent to damage the cargo.  The email correspondence between
Shipco and Maersk indicates Shipco was just as dissatisfied with
the situation as Mbacke and made repeated attempts to locate the
container.  In regards to Maersk, although the email
correspondence provided some notice to Maersk that the delay was
unacceptable, at most, the subsequent delay of five months
amounts to gross negligence or recklessness on the part of
Maersk.

Mbacke relies on <u>Sea-Land, Inc. v. Lozen Intern LLC</u>, 285
F.3d 808 (9th Cir. 2002), to support his assertion that Maersk's
continued apathy following the email exchange raises a triable
issue of fact as to unreasonable deviation.  While there are some
factual similarities between this case and <u>Sea-Land</u>, the court
ultimately finds important factual distinctions between the two
which require a different result in this case.

In <u>Sea-Land</u>, a cargo owner sued a carrier for delay in the
shipment of grapes from Mexico to England.  285 F.3d at 813.  The
grapes were to be transported by truck to California, and then
transported by rail to New Jersey, where they would be loaded
onto the carrier's vessel sailing to England.  <u>Id.</u>  The carrier's
railroad agent, however, mistakenly placed the cargo on the wrong
train.  <u>Id.</u>  After the error was discovered, the carrier
attempted to take possession of the cargo and transport it by
truck to New Jersey so that it would arrive at the ship on time.
<u>Id.</u> at 818.  The railroad, however, refused to comply with the
carrier's repeated requests.  <u>Id.</u>  In an internal company email,

14

one of Sea-Land's employees admitted that the railroad was aware
of the damage that would result from delay and still refused to
comply with the carrier's request to transport the cargo by
truck:

> I got with [the railroad] to see if we could get
> containers taken from the train . . . I kept telling
> [the railroad] that these units were vessel protected
> loads, and they had to make the vessel.  There was no
> ambiguity in my needs, with regards these units.  It
> comes down to me wanting to truck these units . . . but
> [the railroad], in their infinite wisdom, decided not
> to allow us to do this.

Id.  The court subsequently held this evidence, coupled with a
letter from Sea-Land to plaintiff expressing the same, raised a
triable issue of fact as to whether the railroad had
intentionally caused damage to the cargo by refusing to transport
the shipment by truck.   Id. at 818-19.

Unlike Sea-Land, in the present case, there is no evidence
to raise an issue of fact as to whether Maersk intentionally
caused damage to the cargo.  Maersk, unlike the railroad in Sea-
Land, had no reason to believe that a delay in shipment would
damage the contents of the cargo.  The equipment was not
perishable and, according to Mbacke, each piece of equipment had
been individually shrink-wrapped, "carefully" loaded, and sealed
in the container prior to the container being loaded on Maersk's
vessel.  (ADF ¶ 5.)  Further, Mbacke never requested Maersk to
ship the cargo by other, faster means like the carrier in Sea-
land.  Such request, if refused, might have raised a triable
issue as to whether Maersk intentionally delayed transport to
cause damage to the goods.  Instead, the only evidence in the
record is an email from Shipco to Maersk notifying Maersk that

15

the delay was upsetting and unacceptable.  The delay of five

months subsequent to this email, at most, constitutes gross

negligence or recklessness on the part of Maersk.  To hold

otherwise and find the delay in transport of the Uganda shipment

an unreasonable deviation would inappropriately expand the

doctrine.  This circuit and others have expressly cautioned

against such expansions.  See, e.g., Vision Air Flight Services,

Inc. v. M/V Nat'l Pride, 155 F.3d 1165, 1174 (9th Cir. 1999)

("[C]ourts and commentators agree that the doctrine should be

sharply limited and have displayed a certain hostility toward

expansion of the deviation doctrine, especially in the context of

quasi-deviation."); Rockwell Internat'l Corp. v. M/V Incotrans

Spirit, 998 F.2d 316, 319 (5th Cir. 1993) ("We decline to expand

the doctrine to [negligent off-loading]."); Universal Leaf

Tobacco Co. v. Campanhia De Navegacao Maritima Netumar, 993 F.2d

414, 417 (4th Cir. 1993) (refusing to "extend the unreasonable

deviation doctrine beyond its current boundaries") (internal

quotations omitted); SPM Corp. v. M/V Ming Moon, 965 F.2d 1297,

1304 (3d Cir. 1992) ("We agree with our sister circuits that the

doctrine of quasi-deviation is not to be viewed expansively in

the post-COGSA era."); B.M.A. Industries, Ltd. V. Nigerian Star

Line, Ltd., 786 F.2d 90, 92 (2d Cir. 1986) ("The principle of

quasi-deviation is arguably inconsistent with COGSA, and is not

one to be extended.") (internal quotations omitted).

Even viewing the evidence in the light most favorable to

Mbacke, the court finds there is no genuine issue of material

fact as to the doctrine of unreasonable deviation.  The court

will thus consider whether Shipco and Maersk are entitled to

16

summary judgment based on the liability limitations in the bill
of lading.

**B.   Fair Opportunity**

Shipco and Maersk claim they have met their evidentiary
burden of showing "fair opportunity" by reciting Section 4(5) in
their respective bills of lading.  Indeed, Clause 8(3) of
Shipco's bill of lading and Clause 7.3 of Maersk's bill of lading
provide the shipper with the option of declaring a higher value
in exchange for paying additional freight.  It is also undisputed
that Shipco's bill of lading and Maersk's waybill contained a
designated space for declaring a higher value, which was not
filled in.  Mbacke, however, argues he never received either the
back page of Shipco's bill of lading, which contains Clause 8(3),
or a copy of Maersk's waybill, which incorporates Clause 7.3.

The court finds there is a factual dispute over whether
Mbacke received notice on the bill of lading of the limited
liability provision in Section 4(5).  Such factual dispute
precludes the granting of Shipco's and Maersk's motions for
summary judgment.  Nemeth v. Gen. Steamship Corp., Ltd., 694 F.2d
609, 612 (9th Cir. 1982) (reversing grant of summary judgment in
carrier's favor because triable issues of fact remained as to
whether shipper was given fair opportunity to choose a higher
liability); Komatsu v. States Steamship Co., 674 F.2d 806, (9th
Cir. 1982) (affirming partial grant of summary judgment in
shipper's favor where incorporation by reference of Section 4(5)
in the bill of lading was insufficient to give shipper notice of
opportunity to declare a higher value for the goods).

17

The Ninth Circuit in similar cases has held that a carrier cannot meet his initial burden of showing fair opportunity where the bill of lading is difficult to read or does not fully recite Section 4(5) of COGSA.  For instance, in Nemeth v. Gen. Steamship Corp., the owner and shipper of household goods sought to recover from an ocean carrier and his agent $22,000 in damages to the goods during transport from Buenos Aires to Los Angeles.  694 F.2d at 610-11.  The carrier and his agent contended that their liability was limited to $500 per package based on a provision reciting Section 4(5)'s liability limitations in the bill of lading.  Id. at 611.  The court reversed the district court's grant of summary judgment in favor of the carrier and his agent because the recitation of Section 4(5) in the bill of lading was "microscopic and blurry."  Id. at 611-12.  The court reasoned that such an "illegible recitation" of Section 4(5) could not provide notice to the shipper of the choice of liabilities and, therefore, was not prima facie evidence of fair opportunity.  Id.

Similarly, in Komatsu, Ltd. v. States Steamship Co., a shipper filed suit against a carrier for damage to a tractor during transport from Kobe, Japan to Seattle, Washington.  674 F.2d at 808.  The carrier argued his liability was limited to $500 based on both a Clause Paramount in the bill of lading that provided COGSA's provisions governed the parties' contractual relations and a separate clause of the bill of lading that provided: "[r]eference is hereby made specifically to value limitations (46 U.S.Code 1304(5)) and time limitations for filing claim and bringing claim (46 U.S.Code 1303(6))[.]"  Id. at 809-10.  The court affirmed a partial grant of summary judgment in

18

the shipper's favor because "merely incorporating COGSA's provisions into a Paramount Clause was not prima facie evidence that a carrier gave the shipper the opportunity to declare a higher value."  Id. at 809 (citing Pan Am. World Airways, Inc. v. Cal. Stevedor & Ballast Co., 559 F.2d 1173 (9th Cir. 1977) (per curiam)).  The court reasoned that the clauses in the bill of lading contained only "oblique reference" to the contents of Section 4(5) and the shipper could not be charged with constructive notice of the minute details of COGSA.  Id. at 810.

Here, the reference is neither "blurry" or "oblique." Plaintiff contends there can be no showing of fair opportunity to declare a higher value because he never received the page which contains Clause 8(3) or incorporates Clause 7.3.  Like the defendants in Nemeth and Komatsu, Shipco and Maersk are alleging their respective bills of lading are prima facie evidence of "fair opportunity."  However, just as in Nemeth and Komatsu, plaintiff Mbacke argues the bill of lading he received did not provide sufficient notice of Section 4(5)'s limitations.

In Nemeth, the plaintiff argued that an illegible recitation of Section 4(5) was not sufficient to provide notice of an opportunity to declare a higher value for the goods, and thereby was not prima facie evidence of "fair opportunity."  In Komatsu, the plaintiff claimed the mere incorporation of Section 4(5) into the bill of lading was similarly insufficient to constitute prima facie evidence of "fair opportunity."  Here, Mbacke asserts that neither the Shipco bill of lading nor the Maersk waybill were delivered to him.  These allegations of non-delivery of the "fair opportunity" provisions clearly support a finding of genuine

19

issues of material fact.

Shipco and Mbacke cite <u>Carman Tool & Abrasives, Inc. v. Evergreen Lines</u>, 871 F.2d 897 (9th Cir. 1989), and <u>Royal Ins. Co. v. Sea-Land Servs.</u>, 50 F.3d 723 (9th Cir. 1995), as supporting their assertions.  Those cases, however, are inapposite because they dealt with the delayed issuance or receipt of a bill of lading, not whether the bill of lading delivered to the plaintiff contained notice of Section 4(5).  <u>See</u> <u>Carman Tool</u>, 871 F.2d at 899-900 ("[Plaintiff] concedes that [defendant's] bill of lading satisfies ["fair opportunity"]. . . .  It argues, nonetheless, that it was denied a fair opportunity to opt for the higher liability limits because it did not see a copy of the bill of lading until long after the goods were shipped."); <u>Royal Ins.</u>, 50 F.3d at 728-29 ("[Plaintiff] argues that because the bill of lading was issued [after the goods were loaded onto the vessel], its liability limitations do not apply, even though the bill of lading complies in every respect with COGSA.").  Thus, <u>Carman Tool</u> and <u>Royal Ins.</u> do not provide a basis for determining the adequacy of the notice on Shipco's bill of lading or Maersk's waybill.

Viewing the evidence in the light most favorable to Mbacke, a reasonable fact finder could conclude that neither Shipco's bill of lading nor Maersk's waybill is prima facie evidence of "fair opportunity."  Accordingly, summary judgment of Mbacke's damages claim is DENIED.

C.  **Agency**

Shipco argues, in the alternative, that even if Mbacke never received a copy of the bill of lading or waybill, he can

nonetheless be held to its terms.  Shipco argues that because an NOVCC, like Trascon, generally acts as the agent of the cargo shipper when it contracts with the ocean carrier, acceptance of the bill of lading by Transcon imputes knowledge of its terms to Mbacke.

The use of general agency principles to hold shippers to the terms of a bill of lading has been called into question in recent years.  The Ninth Circuit in <u>Kukje Hwajae Ins. Co., Ltd. v. M/V Hyundai Liberty</u>, 294 F.3d 1171 (9th Cir. 2002), held that an NOVCC acted as a cargo owner's agent when negotiating a bill of lading with a downstream carrier.  <u>Id.</u> at 1175.  That holding, however, was vacated by the Supreme Court in light of <u>Norfolk Southern Railway v. Kirby</u>, 543 U.S. 14 (2004).  <u>Green Fire & Marine Ins. Co., Ltd. v. M/V Hyundai</u>, 125 S. Ct. 494 (2004), <u>vacating</u> 294 F.3d 1171.  In <u>Norfolk</u>, the Court considered whether an intermediary can bind a cargo owner to the terms of a carrier's bill of lading based on principles of agency law. <u>Norfolk</u>, 543 U.S. at 30.  The Court stated that "reliance on agency law is misplaced" because the traditional indicia of agency, a fiduciary relationship and control by the principal, are generally lacking in relationships between cargo owners and freight forwarders.  <u>Id.</u> at 34.  Nonetheless, the Court held that "an intermediary binds a cargo owner to the liability limitations it negotiates with downstream carriers."  <u>Id.</u>  In reaching this conclusion, the court relied heavily on the fact that the intermediary in question was in actual possession of the goods when negotiating the bill of lading with the downstream carrier. <u>Id.</u> ("[W]e hold that intermediaries, *entrusted with goods*, are

'agents' only in their ability to contract for liability limitations with carriers downstream.") (emphasis added).  Thus, there is some question whether an intermediary can bind a cargo owner to the terms of a bill of lading where, as here, the NOVCC was not entrusted with the goods.

Nevertheless, even assuming agency law can be used to bind a cargo owner to the terms of a bill of lading, the court finds Shipco has not established prima facie evidence of "fair opportunity."  The only evidence in the record of Transcon's receipt of Shipco's bill of lading is the declaration of a Shipco employee, stating she sent a copy of the bill of lading to Transcon.  Putting aside the fact it is uncorroborated and self-serving, the declaration does not establish that Transcon *received* a copy of Shipco's bill of lading.  The declaration merely provides that a copy of the bill of lading was "sent" to Transcon.  Further, a reasonable factfinder could infer that Transcon never received a copy of the relevant portions of Shipco's bill of lading based on Mbacke's assertion that he never received a copy of the bill of lading's back page.

By the same token, the court cannot grant summary judgment to Maersk on a related claim that Shipco accepted the waybill as an agent of Mbacke.  Even though Shipco received a copy of Maersk's waybill, and putting aside the question of whether Shipco was acting as Mbacke's agent at the time, a reasonable factfinder could still deem the waybill insufficient to establish prima facie evidence of "fair opportunity."

The court in <u>Komatsu</u>, *supra*, expressly rejected an argument by a carrier that incorporation of Section 4(5) by reference was

sufficient to provide notice of an opportunity to declare a

higher liability, despite the fact the plaintiff was an

experienced shipper.  674 F.2d at 810.  The court held that the

"opportunity to declare a higher value must present itself on the

face of the bill of lading to constitute prima facie evidence."

Id. (internal quotations omitted).  Incorporation by reference of

Section 4(5), therefore, was not sufficient because "shippers are

not to be charged with constructive notice of the minute details

of COGSA."  Id.

By analogy, Maersk cannot rely on the incorporation of its

long form bill of lading to show prima facie evidence of "fair

opportunity."  The Maersk waybill suffers from the same defect as

the bill of lading in Komatsu--it does not recite the opportunity

to declare a higher liability "on its face."  Instead, just as in

Komatsu, the waybill merely incorporates a separate document that

recites Section 4(5)'s liability limitations.  Accordingly,

Maersk's waybill does not establish prima facie evidence of "fair

opportunity."[15]

Finally, Shipco asserts that summary judgment is appropriate

because it had done business with Transcon on numerous occasions;

thus, Transcon should have been aware of the terms and conditions

in Shipco's bill of lading through their course of dealing. The

case cited by Shipco in support, Travelers Indem. Co. v. Vessel

---

[15]    Maersk's cites the recent decision of Starrag v.
Maersk, Inc., 486 F.3d 607 (9th Cir. 2007), as supporting the
proposition that incorporating by reference a long form bill of
lading satisfies fair opportunity.  However, the issue in Staragg
was whether a long form bill of lading extending liability
limitations beyond the term in Section 7 of COGSA conflicts with
COGSA such that the package limitations cannot be enforced.
Starrag is therefore not a case about "fair opportunity."

1   Sam Houston, 26 F.3d 895 (9th Cir. 1994), however, dealt with a
2   situation in which an intermediary was entrusted with goods to
3   negotiate transportation with a downstream carrier.  Further, the
4   intermediary received a bill of lading that satisfied "fair
5   opportunity."  Aside from the question of whether an intermediary
6   never entrusted with goods, like Transcon, can be considered
7   Mbacke's agent for purposes of liability, the court has already
8   noted that the proffered evidence in support of Shipco's
9   assertion does not provide prima facie evidence of Transcon's
10  "fair opportunity" to declare a higher liability.  Accordingly,
11  summary judgment is DENIED as to these theories.

12      **D.   <u>Tariff</u>**

13      Shipco claims that even if Mbacke, or Transcon acting as
14  Mbacke's agent, never received a copy of the bill of lading,
15  Mbacke is nevertheless on notice of its terms because of Shipco's
16  published tariff.  As support, Shipco cites <u>Komatsu, Ltd. V.
17  States Steamship Co.</u>, *supra*, 674 F.2d 806 (9th Cir. 1982).[16]

18      However, <u>Komatsu</u> assumed, without deciding, that a tariff
19  gives a shipper constructive notice.  674 F.2d at 811.  The court
20  never addressed the constructive notice issue because it found
21  the tariff at issue provided inadequate notice of Section 4(5).
22  <u>Id.</u>  In <u>Komatsu</u>, the tariff stated that damage liability would be
23  governed by the bill of lading.  <u>Id.</u>  The bill of lading, in

24
25      [16]   Shipco also cites <u>Port of Tacoma v. S.S. Duval</u>, 364
    F.2d 615 (9th Cir. 1966), for the proposition that a tariff gives
26  constructive notice to a shipper of a bill of lading's terms.
    <u>Port of Tacoma</u>, however, addressed whether a published tariff
    that purported to give the port a lien on vessels for failure to
27  pay wharfage and cargo handling services gave carriers
    constructive notice of its terms.  <u>Id.</u> at 617.  <u>Port of Tacoma</u> is
28  therefore distinguishable from the present action.

turn, incorporated by reference Section 4(5).  Id.  The court
held it would be "anomalous to conclude a tariff rule provides
[constructive] notice if that rule's operation depends upon the
shipper having constructive notice of the same COGSA provision."
Id.

     If the court in Komatsu had addressed the constructive
notice issue, it is not entirely clear it would have accepted the
tariff argument as a viable theory of "fair opportunity."  In
Komatsu, the court rejected an argument by a carrier that
incorporation of Section 4(5) by reference was sufficient to
provide constructive notice of an opportunity to declare a higher
liability, despite the fact the plaintiff was an experienced
shipper.  674 F.2d at 810.  The court reasoned that "[t]he bill
of lading is usually a boilerplate form drafted by the carrier,
and presented for acceptance as a matter of routine business
practice to a relatively low-level shipping employee."  Id. at
810.  "[I]mputing such knowledge of COGSA applicability and
provisions," the court concluded, "is an assumption that may go
beyond the bounds of commercial realism."  Id.  If the Ninth
Circuit was unwilling to recognize constructive notice through a
provision in a bill of lading incorporating COGSA's Section 4(5),
it is doubtful the Ninth Circuit would hold a recitation of
Section 4(5) in a carrier's published tariff provides
constructive notice of "fair opportunity."

     However, even assuming constructive notice through a tariff
is a viable legal theory (which is not entirely clear from the
caselaw and which issue the court does not decide herein), the
court finds there is insufficient evidence to hold Mbacke on

constructive notice of Shipco's tariff.  Shipco has not provided
the court with the copy of its tariff.  Rather, the Supplemental
Declaration of Carol Ann Burch, filed by Shipco on January 11,
2008, states that a copy of Shipco's tariff can be accessed
online through Dart Maritime's website.  The court has visited
said website and learned it could only obtain a copy after
registering with Dart Maritime for a fee of $50.  It is Shipco's
burden to proffer this evidence in admissible form.  It is not
incumbent on the court to obtain it by registering on behalf of
Shipco with Dart Maritime.  Therefore, because there is
insufficient evidence of the tariff itself, the court cannot
determine whether the contents of Shipco's purported tariff are
sufficient to provide constructive notice.  Based on the
foregoing, summary judgment as to this theory is DENIED.[17]

**E.   Indemnity**

Maersk argues that in the event it is found liable to Shipco
for damages, such damages are limited to $500 under the terms of
the waybill and incorporated long form bill of lading.

There is no Ninth Circuit case addressing the issue of
whether a freight forwarder can demand full indemnification when
the carrier waybill's terms limit the carrier's liability.

---

[17]     In a final effort to succeed, Shipco argues Mbacke is
bound by the terms of the bill of lading because he was a party
to the bill of lading under the definition of "Merchant."  See
All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu, 7 F.3d 1427
(9th Cir. 1993) (holding shipper to terms of bill of lading where
he fell within the bill of lading's definition of a "Merchant").
Like all contracts, however, bills of lading require some form of
acceptance, such as filing suit on the bill of lading.  Id. at
1432.   No such acceptance exists in this case because Mbacke
contends he never received a copy of the back page of the bill of
lading, which defines Merchant, and he is not suing on the basis
of the bill of lading.

However, the issue was addressed by the Northern District in
Seagate Tech. LLC v. Dalian China Express Internat'l Corp. Ltd.,
169 F. Supp. 2d 1137 (N.D. Cal. 2001).  In Seagate, a freight
forwarder demanded full indemnification plus the cost of
defending the shipper's original suit from a carrier.  Id. at
1144.  The carrier's air waybill limited its liability to $20 per
kilogram of goods lost unless a higher value for the cargo was
declared and an additional charge paid.  Id. at 1139.  The
freight forwarder urged the court to adopt the Second Circuit's
holding in Victoria Sales Corp. v. Emery Air Freight, Inc., 917
F.2d 705 (2d Cir. 1990) (holding waybill liability limitations do
not extend to a claim for indemnity).  Seagate, 169 F. Supp. 2d
at 1143.  Like the district court in Seagate, this court also
finds Victoria Sales' analysis of the issue persuasive.  Id. at
1145.

     In Victoria Sales, a freight forwarder agreed to ship
pharmaceuticals from Germany to New York.  917 F.2d at 706.  The
freight forwarder hired a carrier to handle the transport, who in
turn hired another carrier to transport the shipment.  Id.  When
the consignee of the shipment arrived in New York, the shipment
could not be found.  Id.

     The issue for the Second Circuit in Victoria Sales was
whether the carrier that actually handled the shipment was
required to indemnify the freight forwarder when provisions of
the carrier's waybill limited its liability to $20 per kilogram
of goods unless a higher liability was declared.  Id. at 708.
The court held the waybill's liability limitation applied only to
claims for loss or damage to cargo; "[i]t [did] not address the

27

right and liabilities between [the carrier] and a party in [the freight forwarder's] status." Id. The court reasoned that to hold otherwise would abrogate the common law principle that a primary wrongdoer must indemnify a party whose liability is secondary. Id. Thus, "[a]bsent an explicit contractual provision to the contrary," the Second Circuit saw "no reason to extend the waybill's liability limitations to [the freight forwarder's] indemnity claim." Id.

Applying these principles, this court holds that Shipco can seek full indemnification from Maersk. Neither COGSA Section 4(5) nor the liability limitations clause of the Maersk long form bill of lading purport to include all types of claims in the $500-per-package limitation. The statute and the bill of lading are concerned with protecting carriers against exposure to liability for the loss of cargo when the shipper has not declared the value and paid additional freight for it. Further, the common law permits a party, vicariously liable for injury, to seek indemnity from a party primarily liable for injury. See United Air Lines v. Wiener, 335 F.2d 379, 399 (9th Cir. 1964) ("There is general agreement that indemnity is permitted where the indemnitee has only an imputed or vicarious liability because of a special relationship with the actual wrongdoer but is not personally at fault."). Here, because Shipco hired Maersk to handle the cargo, it is arguably responsible for Maersk's acts. It is further clear from the record that the damage to the cargo occurred while in Maersk's custody and control. Thus, Shipco may have a claim for indemnity in the event it is found liable to Mbacke for damages to the cargo.

28

Maersk urges the court to follow <u>E.M.S. Industrie S.A. v.
Polskie Towarzystwo Okretowe</u>, 608 F. Supp. 1133 (E.D.N.Y. 1985)
(holding contribution claim is subject to $500-per-package
limitation in bill of lading).[18]   In <u>E.M.S.</u>, a carrier moved for
summary judgment limiting its liability in indemnity to $500
based on a provision of its bill of lading reciting Section 4(5).
608 F. Supp. 2d at 1134.   The court held the limitation applied
because the language of the bill of lading indicated the carrier
would not "in any event" be liable for any damages to the goods
exceeding $500.   <u>Id.</u> at 1135.   The court reasoned that "any
event" included holding the carrier liable in indemnity for the
full amount of loss.   The court thus refused to "frustrate the
statutory scheme of liability" and limited the indemnity claim to
the $500-per-package limitation in the bill of lading  <u>Id.</u> at
1135-36.

The reasoning of <u>E.M.S.</u>, however, is not persuasive.   As
previously noted, Section 4(5) does not purport to cover all
types of claims and such an expansive reading of the statute
would abrogate several common law doctrines, including indemnity,
in COGSA actions.   <u>Cf</u>. <u>Ins. Co. of N. Am. v. M/V Ocean Lynx</u>, 901
F.2d 934, 942 (2d Cir. 1991) (allowing attorney's fees recovery
in COGSA indemnity action); <u>Noritake Co. v. M/V Hellenic
Champion</u>, 627 F.2d 724, 730 (5th Cir. 1980) (allowing recovery of
pre-judgment interest in COGSA action); <u>Seagate Technology LLC v.</u>

---

[18]     Maersk also cites <u>Caterpillar Overseas v. Farrell
Lines, Inc.</u>, 1988 A.M.C. 2894 (E.D. Va. 1988), <u>aff'd</u> 900 F.2d 714
(4th Cir. 1991).   The court in <u>Caterpillar</u>, however, did not
explain its reasoning for applying Section 4(5)'s liability
limitations to indemnity actions.   1988 A.M.C. at 2901-02.

_Dalian China Express Internat'l Corp. Ltd_, 169 F. Supp. 2d 1137, 1144 (N.D. Cal. 2001) (holding claim for indemnity is not limited by the terms of the bill of lading in COGSA action).  Absent an express contractual provision in the bill of lading to the contrary, the court will not hold that an action for indemnity is limited to the terms of Maersk's bill of lading.  Maersk's motion for summary judgment as to this claim is therefore DENIED.

### CONCLUSION

For the foregoing reasons, third-party defendant/fourth-party plaintiff Shipco's motion for summary judgment is DENIED. Fourth-party defendant Maersk's motion for summary judgment is also DENIED.

IT IS SO ORDERED

DATED: January 25, 2008.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE